Filed 10/28/15  P. v. Boyd CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL DAVID BOYD,<br><br>    Defendant and Appellant. | D066762<br><br><br><br>(Super. Ct. No. SCD246173) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Michael David Boyd guilty of one count of indecent exposure (Pen. Code, § 314, subd. (1)),[1] with the further finding that Boyd committed the offense after having entered an inhabited dwelling (§ 314); one count of burglary of an inhabited dwelling (§§ 459, 460); and one count of simple assault (§ 240). The trial court sentenced Boyd to a six-year term in prison.

Boyd contends that (1) the trial court erred in instructing the jury on certain target felonies for the burglary count; (2) insufficient evidence supports the conviction for indecent exposure; and (3) the trial court erred in denying Boyd's motion for self-representation, made on the day of trial. We conclude that Boyd's arguments lack merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In February 2013, Jillian K. was living in an apartment across the hall from Boyd's apartment. Around 3:30 p.m., Jillian heard Boyd screaming outside the front door of her apartment. She opened the door and saw Boyd with his hands over his head screaming, "Molly. Molly. I love you, Molly. I've always loved you, Molly. I love you." After Jillian asked Boyd what was going on and if he needed her help, Boyd turned to Jillian and put his hands on her shoulders, touching her neck, and stated, "Oh, Molly, you're here. I love you. I've always loved you." Boyd's eyes were glassy and unfocused. Jillian told Boyd that she was not Molly, that she was Jillian. Boyd seemed to become

---

1     Unless otherwise indicated, all further statutory references are to the Penal Code.

lucid for a moment and recognize Jillian, as he backed up with just one hand still touching Jillian, and stated "It's cool. It's cool, babe. It's all right. Jillian, it's okay."

Jillian took a step back and put her hand on the door. With one hand still on Jillian's shoulder and one hand on the door, Boyd started yelling in an aggressive manner, "Just suck me dry, suck me dry. Just do it. You know you want to do it. Just suck me dry." Jillian looked down and saw that Boyd's sweatpants were around his ankles, and he was not wearing any underwear, so that his penis was exposed. At no time did Jillian see Boyd with an erection, and Jillian did not see how Boyd's pants came to be around his ankles. Boyd stated that if Jillian sucked him dry, the world would be a better place, and that it was all he wanted and all he needed.

Jillian pushed Boyd away, telling him to go back to his apartment, but Boyd moved forward and pushed Jillian into the apartment, and Boyd ended up on his knees inside the apartment. Boyd looked at Jillian and screamed "Fuck you, Mark, Fuck you, Mark, I've got her now. She's mine. I'm taking her." Mark was Jillian's ex-husband, whom Boyd had met. As Jillian screamed at Boyd to get out of her apartment, he wrapped his arms around her legs and said, "You're mine. I'm taking you. You're mine." Boyd eventually released Jillian's legs, but then he lunged at her, causing her to stumble backwards, fall onto a table, and then onto the floor.

Boyd moved on top of Jillian, with one hand on her throat and one on her mouth, while wiggling his body to try to keep her on the ground. Boyd stated in a demanding manner, "It's okay, just let me do this. I just need to do this. It's okay. It's okay. You've got to let me do this."

3

As Jillian screamed for Boyd to get off of her, Jillian's adult son entered the room and used his leg to pry Boyd off of Jillian. After Jillian got free from Boyd, she called 911 while Boyd lay on the floor on his back with his legs in the air, naked and mumbling something. Boyd then got up and walked into his apartment and closed the door, leaving his sweatpants in Jillian's apartment. As a result of the incident, Jillian had bruising on her back and legs, red marks on her neck and a broken rib.

When police officers made contact with Boyd in his apartment, he repeatedly said, "Molly, I love you." Boyd also offered to have oral sex with one of the officers. The police arrested Boyd and took him to a mental health facility and then to jail.

Boyd was charged with three counts: (1) assault with the intent to commit oral copulation, causing great bodily injury (§§ 220, subd. (a)(1), 12022.7, subd. (a)); (2) burglary of an inhabited dwelling (§§ 459, 460, 667.5, subd. (c)(21)); and (3) indecent exposure after having entered an inhabited dwelling (§§ 314, subd. (1), 314).

On the day of trial, Boyd made a motion to discharge his appointed attorney and to represent himself, but the trial court denied the motion, concluding that it was not timely.

At trial, the jury found Boyd not guilty of assault with the intent to commit oral copulation, convicting him instead of the lesser included offense of simple assault. (§ 240.) The jury found Boyd guilty on the two remaining counts of burglary and indecent exposure, including a true finding for the indecent exposure count that the offense was committed after having entered an inhabited dwelling without consent.

The trial court sentenced Boyd to prison for six years.

4

## II

## DISCUSSION

A. *The Trial Court Did Not Err in Instructing on the Target Offenses for Burglary Identified by the People*

We first consider Boyd's argument that the trial court committed instructional error related to the burglary count.

In count 2, Boyd was charged with burglary, with the allegation that he unlawfully entered Jillian's apartment with the intent to commit a felony. (§ 459.) In response to a pretrial motion in limine by defense counsel, the prosecutor identified four possible target felonies that Boyd allegedly intended to commit when entering the apartment: oral copulation by force or fear (§ 288a, subd. (c)(2)), rape (§ 261, subd. (a)(2)), sexual penetration by force or fear (§ 289, subd. (a)(1)), or felony sexual battery (§§ 242, 243.4, subds. (a), (d)). The jury instructions identified these four target felonies, stating that "[a] burglary was committed if the defendant entered with the intent to commit Oral Copulation by Force or Fear, Rape, Sexual Penetration by Force or Fear, or Felony Sexual Battery." The jury was also instructed on the elements of each of the target felonies.

On appeal, Boyd contends that the trial court erred by identifying the target felonies of rape, sexual penetration by force or fear, and felony sexual battery in the burglary instructions because, according to Boyd, the evidence did not support an instruction on those target felonies. Specifically, Boyd argues "there is no evidence in the record that [he] intended to commit rape, penetration by force or fear, or sexual

5

battery."  Boyd contends that the only target felony supported by the evidence was oral copulation by force or fear, based on the fact that he told Jillian to "suck me dry." Further, Boyd contends that because the jury found him *not* guilty of assault with the intent to commit oral copulation, the jury must necessarily have concluded that he did not enter the apartment with the intent to commit oral copulation, and that the burglary conviction must accordingly have been based on one of the three other target felonies, which Boyd claims should not have been included in the jury instructions at all.[2]  As we will explain, we conclude that Boyd's argument lacks merit.[3]

---

[2]    Although we need not resolve the issue in light of our conclusion that the evidence supports an instruction on all four of the target felonies, we note that the jury's not guilty verdict on the charge of assault with intent to commit oral copulation does not — as Boyd contends — necessarily establish that the jury found that Boyd did not intend to force Jillian to orally copulate him during the incident.  The jury could have reasonably interpreted the evidence to establish that although Boyd was focused on forceful oral copulation when he was standing *outside* of Jillian's apartment and speaking to her without assaulting her, by the time Boyd forced his way *inside* the apartment and was *assaulting* Jillian by lying on top of her and choking her, he was no longer focused on oral copulation, but on a different type of sexual assault, such as rape.

[3]    The People contend that Boyd forfeited this appellate challenge to the inclusion of certain target felonies in the burglary instructions because he did not make that objection in the trial court.  Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.  (§ 1259; *People v. Battle* (2011) 198 Cal.App.4th 50, 64.)  Here, the record shows that Boyd made a brief and unclear objection to the burglary instruction.  Specifically, when discussing the burglary instructions, defense counsel stated, "Same objection, Your Honor, as the in limine of the numbering of different crimes in count 2."  The trial court overruled the objection.  It is unclear what defense counsel was referring to by incorporating his in limine argument into his instructional objection, but we need not, and do not, decide whether the objection was sufficient to preserve Boyd's appellate argument that three of the target felonies should not have been included in the instructions, as we reject Boyd's appellate argument on the ground that it lacks substantive merit.

6

Boyd's argument relies on the principle that "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) Accordingly, Boyd's argument has merit only if he can establish that the inclusion of the target felonies of rape, sexual penetration by force or fear, and felony sexual battery in the burglary instructions had "no application to the facts of the case" (*Guiton*, at p. 1129) and was " 'irrelevant to the issues raised by the evidence.' " (*Saddler*, at p. 681.)

As the jury was instructed, the crime of rape consists of nonconsensual sexual intercourse (§ 261, subd. (a)(2); CALCRIM No. 1000); the crime of sexual penetration by force or fear consists of nonconsensual genital or anal penetration by an unknown object or foreign object other than a sexual organ (§ 289, subd. (a)(1); CALCRIM No. 1045); and felony sexual battery consists of nonconsensual intimate touching while restraining a person for the purpose of sexual arousal, gratification or abuse (§§ 242, 243.4, subds. (a), (d); CALCRIM No. 935). Here, the evidence was sufficient to support a finding that Boyd entered Jillian's apartment with the intent to commit rape, sexual penetration by force or fear, or felony sexual battery, and thus the instruction was therefore properly given.

7

As we have explained, immediately before entering Jillian's apartment, Boyd made direct sexually aggressive comments to Jillian, indicating while his penis was exposed that he wanted Jillian to orally copulate him, telling her to "suck him dry." As the confrontation moved into Jillian's apartment, Boyd continued to behave in a manner that could reasonably be construed as sexually aggressive, but no longer focused on the demanded act of oral copulation. Specifically, while naked from the waist down, Boyd climbed on top of Jillian and forcefully restrained her with his body weight, while stating, in a demanding manner, "It's okay, just let me do this. I just need to do this. It's okay. It's okay. You've got to let me do this." This occurred immediately after Boyd held onto Jillian's legs, stating, "You're mine. I'm taking you. You're mine." A reasonable finder of fact could interpret Boyd's behavior and words while inside the apartment as evidence that by the time he entered the apartment he intended to sexually assault Jillian, not just by forcing her to orally copulate him, as he suggested earlier, but by raping her, touching her intimate areas or sexually penetrating her without her consent. Accordingly, the evidence amply supports the inclusion of the target felonies of rape, sexual penetration by force or fear, and felony sexual battery in the burglary instructions.

B.     *Substantial Evidence Supports the Indecent Exposure Conviction*

Next, we consider Boyd's contention that insufficient evidence supports his conviction for indecent exposure. As we will explain, we reject the argument.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—

8

from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

A person commits the crime of indecent exposure when he "willfully and lewdly . . . [¶] . . . [e]xposes his person, or the private parts thereof, . . . in any place where there are present other persons to be offended or annoyed thereby . . . ." (§ 314, subd. (1).) "[A] person does not expose his private parts 'lewdly' within the meaning of section 314 unless his conduct is sexually motivated. Accordingly, a conviction of that offense requires proof beyond a reasonable doubt that the actor not only meant to expose himself, but intended by his conduct to direct public attention to his genitals for purposes of sexual arousal, gratification, or affront." (*In re Smith* (1972) 7 Cal.3d 362, 366 (*Smith*).)

Boyd contends that "[t]here is not substantial evidence that [he] willfully exposed himself to Jillian[,]" because the evidence can only be reasonably interpreted as establishing that "his pants simply fell down during the assault." Further, Boyd contends that even if he *did* realize that his pants had fallen down at some point during the incident, the only inference supported by the evidence is that he failed to pull them back up because he was so "actively engaged in the . . . assault" that he was "unable to deal with his fallen pants," not because he intended to expose himself. Boyd also argues that

9

the indecent exposure conviction is not supported by the record because there is no evidence of him "direct[ing] . . . attention to his genitals for purposes of sexual arousal, gratification, or affront." (*Smith*, *supra*, 7 Cal.3d at p. 366.) As we will explain, we disagree with Boyd's characterization of the evidence and conclude that substantial evidence supports a finding that Boyd willfully exposed himself to Jillian for a sexual purpose.

As Jillian testified, she did not see Boyd's pants fall to his ankles, and thus did not know if Boyd pulled down his pants down intentionally or if the pants fell down accidentally.[4] Thus, there is no *direct* evidence that Boyd intentionally pulled down his pants to expose himself. However, the *circumstantial* evidence strongly supports an inference that Boyd intentionally pulled down his pants to show Jillian his penis and to obtain sexual gratification. First, contrary to Boyd's suggestion, there was no physical struggle occurring when Boyd's pants fell down. Instead, Boyd was standing at Jillian's front door with a hand on her shoulder and hand on the door. Immediately prior to that, Boyd was standing at the door with both hands on Jillian's shoulders. Jillian looked

---

[4]     Boyd acknowledges Jillian's testimony that she did not see how Boyd's pants ended up around his ankles. However, focusing on Jillian's later statement during her testimony that Boyd's "pants had fallen down, and he was asking me to suck on him," Boyd argues that Jillian had *changed* her testimony to assert that Boyd's pants had *accidentally* fallen down. We reject the argument. Based on the entire context, it is not reasonable to understand Jillian's statement that Boyd's pants "had fallen down" as an assertion that Boyd's pants had fallen down *accidentally*, as Jillian had already testified that she did not see how the pants ended up around Boyd's ankles. Jillian's reference to the fact that the pants "had fallen down" is most reasonably understood as describing the fact that that pants were no longer around Boyd's waist, not an explanation of *how* the pants came to be around Boyd's ankles.

10

down and saw that Boyd was no longer wearing his pants.  Therefore, there is no evidence of other physical activity, other than a willful act by Boyd, that could have made Boyd's pants fall down.  Second, Boyd's exposure of his penis was done at the exact moment that Boyd stated to Jillian that she should "suck him dry," referring to Jillian performing oral copulation on his penis.  From the fact that Boyd stood in front of Jillian with an exposed penis at the same time he demanded oral sex, a reasonable factfinder could infer that Boyd exposed himself to Jillian for the purpose of drawing her attention to the sexual organ on which he wanted her to perform oral copulation.  Further, because Boyd was demanding oral sex from Jillian, it is also reasonable to infer that Boyd was exposing his penis for the purpose of obtaining sexual gratification through oral copulation.

Moreover, the indecent exposure conviction is independently supported by the evidence of what occurred once Boyd was *inside* the apartment.  Specifically, after Boyd entered the apartment he kept his penis exposed by not pulling up his pants.  During this time, Boyd was making statements and taking actions that could reasonably be interpreted as indicating that he intended to sexually assault Jillian, such as stating that he was "taking" her and "I just need to do this," while lying on top of her and physically restraining her.  Because this activity occurred while Boyd's penis was exposed, a reasonable fact finder could conclude that Boyd kept his penis exposed for the purpose of facilitating the sexual assault that he intended to perpetrate.  Accordingly, Boyd's act of continuing to expose his penis while inside the apartment also supports a conviction for

11

indecent exposure, because that conduct also could reasonably be understood as a willful exposure of Boyd's penis for the purpose of sexual gratification.

Boyd contends that the only reasonable inference from the evidence is that he was too disoriented to know that his pants had fallen down and therefore intended nothing sexual by exposing his penis. We disagree. Although the record certainly supports a finding that Boyd was experiencing some kind of mental disturbance during the incident, in that he was acting very strangely and referring to Jillian as "Molly," who was not there, a reasonable finder of fact could conclude that Boyd was sufficiently coherent to understand what he was doing. Boyd appeared to recognize Jillian during the incident, referring to her name and the name of her ex-husband. The evidence supports a conclusion that Boyd was taking conscious, forceful and directed action toward the goal of engaging in some sort of sexual activity with Jillian, first by exposing himself and demanding oral sex, and later by attacking her and stating that he was "taking" her and stating, "I just need to do this." Based on all of the evidence, a reasonable fact finder could conclude that Boyd was not too mentally disturbed to have known of and intended the exposure of his penis to Jillian for a sexual purpose.

In sum, we reject Boyd's argument that insufficient evidence supports the conviction for indecent exposure.

C.      *The Trial Court Did Not Err in Denying Boyd's Motion to Represent Himself*

On the day of trial, Boyd made a motion for the trial court to allow him to discharge his appointed counsel and to represent himself. The trial court concluded that

12

the motion was not timely and exercised its discretion to deny the motion. Boyd contends that the trial court erred in denying his motion for self-representation.

We begin our analysis with an overview of the relevant procedural history of this action. Boyd was first charged in February 2013, and trial did not take place until August 2014. Although there is no indication that the delay was due to the fault of Boyd or a design to avoid trial, it is relevant that Boyd was represented by several different attorneys during that time, and we focus on that history here.

Specifically, after being represented by the public defender's office for several months, according to Boyd, he concluded that the public defender was not adequately representing him, and he thus hired private counsel in April 2013. In October 2013, after concluding that private counsel was not providing adequate representation, Boyd discharged that attorney and asked to be represented once again by the public defender's office.[5] Boyd concluded that the newly assigned attorney from the public defender's office wanted to follow a defense strategy that Boyd did not agree with, and accordingly in December 2013, he filed a motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), asking to have that counsel relieved and substitute counsel appointed. The trial court granted the motion in January 2014, finding that there was an irreconcilable

---

[5] Boyd requests in a footnote to his appellate brief that we take judicial notice of a Web site showing his private attorney's purported current ineligibility to practice law. "To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order." (Cal. Rules of Court, rule 8.252(a)(1).) Boyd has not complied with that procedure, and we accordingly reject the request as procedurally improper.

breakdown in communication, and appointed counsel from the alternate public defender's office for Boyd. The alternate public defender's office initially assigned a certain attorney to represent Boyd, but replaced that attorney with trial counsel James McMahon in June 2014, who obtained a continuance of the trial date. McMahon then suffered a sports injury that incapacitated him for five weeks, and trial was therefore continued again to August 25, 2014.

At some point during McMahon's preparation for trial, Boyd conferred with McMahon and determined that he did not agree with McMahon's defense strategy, which was the same strategy that the public defender's office had planned to follow. Specifically, Boyd believed that the defense strategy should be to dispute Jillian's version of what occurred during the incident rather than to focus on establishing that Boyd's mental state during the incident prevented him from forming the necessary specific intent.

On the day of trial, August 25, 2014, Boyd filed a *Marsden* motion, requesting that McMahon be relieved as counsel and that an attorney from the office of assigned counsel be appointed to represent him. The trial court denied the motion at a hearing held during the morning court session on August 25.

At the afternoon court session on the same day, immediately before the trial court planned to begin considering motions in limine and discussing jury selection procedures, Boyd made a motion to discharge McMahon and represent himself. At the hearing on Boyd's motion for self-representation, the prosecutor and defense counsel both represented that they were prepared to proceed immediately with the trial; Boyd stated

14

that he would require an undetermined amount of time to prepare for trial if he were to represent himself; and the prosecutor stated that the victim, Jillian, had suffered significant emotional distress each time a new trial date was set. The trial court denied Boyd's motion for self-representation, determining that Boyd had ample earlier opportunities to assert the right to represent himself, and under the totality of the circumstances, Boyd's motion was not timely. The case therefore proceeded to trial, with McMahon representing Boyd.

"A defendant has a federal constitutional right to represent himself if he voluntarily and intelligently elects to do so. (*Faretta v. California* (1975) 422 U.S. 806.) In order to invoke an unconditional right of self-representation, the defendant must assert the right '*within a reasonable time prior to the commencement of trial*.' [Citations.] A motion made after this period is addressed to the sound discretion of the trial court." *People v. Burton* (1989) 48 Cal.3d 843, 852, italics added.) On the other hand, "when a motion to proceed *pro se* is *timely* interposed, a trial court *must* permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so," and has no discretion to deny a request meeting those requirements. (*People v. Windham* (1977) 19 Cal.3d 121, 128, italics added.)

Here, because the trial court determined that the motion for self-representation was *not timely*, it had the authority to exercise its discretion on the motion, and decided to deny it. The two disputed issues before us, accordingly, are (1) whether the motion for self-representation was untimely, giving the trial court the discretion to decide to deny it;

15

and (2) if we decide the motion was untimely, whether the trial court abused its discretion in denying the motion.

We first consider the issue of whether Boyd asserted the right to self-representation within a reasonable time prior to the commencement of trial. "[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*People v. Lynch* (2010) 50 Cal.4th 693, 724 (*Lynch*), abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-644.) In assessing timeliness, "a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Lynch*, at p. 726.) Although our Supreme Court in *Lynch* directed trial courts to consider the totality of circumstances in deciding whether a motion for self-representation is timely, it also explained that there are "extreme" circumstances in which a motion will not be timely, regardless of the circumstances. (*Lynch*, at p. 723.) Our Supreme Court noted in *Lynch* that it had "held on numerous occasions that *Faretta* motions made *on the eve of trial* are untimely." (*Lynch*, at p. 722, citing *People v. Valdez* (2004) 32 Cal.4th 73, 102; *People v. Horton* (1995) 11 Cal.4th 1068, 1110; *People v. Clark* (1992) 3 Cal.4th 41, 99-100 (*Clark*); *People v. Frierson* (1991) 53 Cal.3d 730, 742.) Thus, as *Lynch* explained, only if a motion for self-representation is made "outside

16

[the] two extreme time periods" (*Lynch*, at p. 723), which are — on the one extreme — "on the eve of trial" (*id*. at p. 722) and — on the other extreme — "made long before trial" (*id*. at p. 723), may "pertinent considerations . . . extend beyond a mere counting of the days between the motion and the scheduled trial date" (*ibid*).  Following *Lynch*, case law has observed that "a trial court rarely should grant such a motion on the day set for trial," as "[a] motion made that close to the day set for trial is 'extreme' . . . and now is disfavored . . . ."  (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1277-1278, citations omitted.)

Here, Boyd's motion was unquestionably made on the "eve of trial," within the meaning of that term as discussed in *Lynch*, *supra*, 50 Cal. 4th at page 722, as it was made on the afternoon when trial proceedings were scheduled to commence.  Therefore, we may conclude, on the basis of the motion's timing alone, that it was untimely.

However, even when we examine the other relevant factors identified in *Lynch* for determining whether a motion for self-representation before trial is timely, those factors also lead us to conclude that the motion was untimely.[6]

---

6      *Lynch*, *supra*, 50 Cal.4th 693, did not specify whether a de novo or abuse of discretion standard governs review of a trial court's determination on the question of timeliness.  However, *Lynch* made clear that if the motion is found to be untimely, it is *then* " 'addressed to the sound discretion of the court' " (*id*. at p. 722), which strongly suggests that the initial determination of timeliness is an issue committed to our independent review.  This is the same standard used in reviewing another central issue concerning whether a defendant is constitutionally entitled to having his self-representation motion granted, namely whether such a motion is knowingly and voluntarily made. (*People v. Marshall* (1997) 15 Cal.4th 1, 24.)  We accordingly apply a de novo standard of review in deciding whether Boyd's motion for self-representation was timely.

17

The first relevant factor is "the time between the motion and the scheduled trial date." (*Lynch*, *supra*, 50 Cal.4th at p. 726.) Here, as we have discussed, the motion was made on the scheduled trial date, leaving no time between the motion and the scheduled trial date.

A second relevant factor is "whether trial counsel is ready to proceed to trial." (*Lynch*, *supra*, 50 Cal.4th at p. 726.) As we have discussed, both the prosecutor and defense counsel stated that they were ready to proceed immediately to trial. In contrast, Boyd stated that he would require an undetermined amount of time to prepare for trial if he were to represent himself. As our Supreme Court observed in *Lynch*, under similar circumstances, "if the self-representation motion had been granted, defendant would have required an *undetermined amount of time* to investigate and prepare for trial. A trial court may properly consider the delay inherently caused by such uncertainty in evaluating timeliness." (*Id*. at p. 728, italics added.) The undetermined delay that would be caused by granting the motion for self-representation, when counsel was ready to proceed immediately, supports a conclusion that the motion was untimely.

Third, we consider "the number of witnesses and the reluctance or availability of crucial trial witnesses." (*Lynch*, *supra*, 50 Cal.4th at p. 726.) Although there were no problems with the *availability* of witnesses in this case, *Lynch*'s third factor is implicated to the extent that the victim, Jillian, was the central witness at trial, and, as the prosecutor explained, Jillian would suffer emotional distress if the trial was continued. Specifically, the prosecutor stated that Jillian was anticipating that trial would be going forward on the designated date after several prior continuances, and each new trial date had "caused

18

[Jillian] significant emotional distress" in that "she has to relive what happened on that day," making it in Jillian's interest "to get this done and behind her."  Relevant to this consideration, when deciding whether a motion for self-representation was timely in *Lynch*, our Supreme Court observed that "[t]he victims and the prosecution ha[ve] a right to a speedy trial . . ." (*id*. at p. 727), parenthetically quoting the statement in *Morris v. Slappy* (1983) 461 U.S. 1, 14, that "in the administration of criminal justice, courts may not ignore the concerns of victims."  (See *Lynch*, at p. 727.)

The final relevant factor is "whether the defendant had earlier opportunities to assert his right of self-representation."  (*Lynch*, *supra*, 50 Cal.4th at p. 726.)  As the trial court correctly observed, Boyd had ample opportunity prior to trial to decide that he should represent himself and to make a motion for self-representation.  Specifically, the record shows that Boyd had disagreements with prior attorneys, causing him to make a prior *Marsden* motion and also to discharge retained counsel.  At any point during the disputes with his prior attorneys, or at any point after McMahon was assigned to represent Boyd in June 2014, Boyd could have evaluated the situation and decided to represent himself, rather than waiting until the eve of trial to make that motion.  Indeed, the record shows that as early as January 8, 2014, during the hearing on Boyd's first *Marsden* motion, Boyd was considering representing himself, as his attorney explained to the trial court during the first *Marsden* hearing that Boyd has "informed me numerous times that if he does not get a new attorney, then he will go pro per."

Boyd argues that he should not have been expected to make a motion for self-representation until his *Marsden* motion was denied on the day of trial.  We disagree.

19

Given the history of this case, Boyd should have anticipated before filing the second *Marsden* motion that it might be denied. Indeed, in ruling on Boyd's first *Marsden* motion, the trial court cautioned Boyd that he is "not the one that dictates what the ultimate defenses are going to be" and that he was expected to cooperate with his next attorney, but Boyd's disagreement with McMahon's trial strategy was the main basis for the second *Marsden* motion.

Based on all of these considerations, we conclude that Boyd's motion for self-representation, made on the date of trial, was not timely.

Having determined that the motion for self-representation was untimely, the second issue is whether the trial court abused its discretion in denying the untimely motion for self-representation. In exercising its discretion to deny an untimely motion, the trial court may consider " 'such factors as the " 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " ' " (*Clark*, *supra*, 3 Cal.4th at pp. 98-99.)

Here, the trial court was well within its discretion to deny Boyd's motion for self-representation. On the date of Boyd's self-representation motion on August 25, 2014, the case had been pending approximately one and a half years, since February 2013. Boyd would have required an undetermined amount of time to prepare himself for trial if he was permitted to represent himself, and it would have caused further distress to the victim, Jillian, if the trial was continued. These factors, all identified by the trial court in

20

deciding to deny Boyd's motion, provided a sound basis for the court's exercise of its discretion.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


AARON, Acting P.J.


PRAGER, J.*

---

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.